**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

**TYLER ZUMALT,**

Plaintiff,

vs.                                                    Case No.

**BECTON, DICKINSON AND COMPANY;**
**C.R. BARD, INC.; BARD ACCESS**
**SYSTEMS, INC., and DOES 1 through 10,**

Defendants.

# <u>COMPLAINT</u>

**COMES NOW**, Plaintiff, Tyler Zumalt (f/k/a Kaylie Zumalt), by and through the undersigned counsel and for his Complaint against Becton, Dickinson & Company, C.R. Bard, Inc.; Bard Access Systems, Inc.; and DOES 1 through 10 (collectively, the "Defendants"), and states as follow:

1.  This is an action for damages relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defectives devices sold under the trade names of Bard PowerPort M.R.I. Implantable Port and Bard PowerPort isp M.R.I. Implantable Port (hereinafter "PowerPort(s)" or "Defective Device(s)").

2.  Plaintiff, Tyler Zumalt, is an adult resident and citizen of Grain Valley, Jackson County, Missouri, and claims damages as set forth below.

3.  Defendant Becton, Dickinson and Company ("BD") is a New Jersey corporation with a principal place of business at 1 Becton Drive in Franklin Lakes, New Jersey.  BD is one of the largest global medical technology companies in the world with diverse business units offering products in various healthcare subfields. BD is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and

introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the PowerPort. BD is the parent company of Defendants C.R. Bard, Inc. and Bard Access Systems, Inc.

4.    Defendant C.R. Bard, Inc. ("Bard") is a New Jersey corporation with its principal place of business located at 1 Becton Drive in Franklin Lakes, New Jersey. Bard conducts business throughout the United States, including the State of Missouri, and is a wholly owned subsidiary of BD. Bard, as an agent of BD, is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the PowerPort. Bard, along with its subsidiaries and business units, was acquired by BD in 2017 in a transaction which integrated and subsumed Bard's business units into BD's business units. In said transaction, Bard's product offerings, including the PowerPort were taken over by and integrated into BD's Interventional segment, one of three of BD's principal business segments. Following the acquisition, Bard's Board of Directors dissolved, with some former Bard directors joining BD's Board of Directors.

5.    Defendant Bard Access Systems, Inc. ("BAS") is a Utah corporation with its principal place of business located in Salt Lake City, Utah. BAS conducts business throughout the United States, including the State of Missouri, and is a wholly owned subsidiary of BD. BAS is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the PowerPort.

6.    BD is the nominal corporate parent of Bard and BAS, but the latter two are alter egos of BD in that BD exercises complete domination and control over Bard and BAS, having

completely integrated the latter's assets, liabilities, and operations into its own such that Bard and BAS have ceased to function as separate corporate entities.

7. BD's control over Bard and BAS has been purposefully used to perpetrate the violation of various legal duties in contravention of Plaintiff's legal rights.

8. The breaches by BD of various legal duties as described herein are the proximate cause of the injuries described herein.

9. In addition to BD's liability for Plaintiff's damages as a result of its abuse of the corporate form, BD is directly liable as a result of its own wrongful conduct as set forth herein.

10. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District and (b) Defendants' products are produced, sold to and consumed by individuals in the State of Missouri, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

13. Defendants have and continue to conduct substantial business in the State of Missouri and in this District, distribute vascular access products in this District, receive substantial compensation and profits from sales of vascular access products in this district, and made

material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

14. Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants, because Defendants are present in the State of Missouri, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

## PRODUCT BACKGROUND

15. The Bard PowerPort M.R.I Implantable Port and the Bard PowerPort isp M.R.I. Implantable Port ("PowerPorts") are one of several varieties of port/catheter systems that have been designed, manufactured, marketed, and sold by Defendants.

16. According to Defendants, the PowerPort is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

17. The intended purpose of the PowerPort is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

18. The PowerPort is a system consisting of two primary components: an injection port and a polyurethane catheter.

19. The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

20. The PowerPort is "indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral

nutrition solutions, blood products, and for the withdrawal of blood samples."

21. The injection port reservoir is constructed principally of Polyoxymethylene plastic, which is also known as Delrin.

22. When a metal needle is inserted into the port reservoir, it often makes contact with the plastic on the posterior surface of the inside of the reservoir, creating small holes, scratches and other damage to the plastic material.

23. The resulting defects in the surface of the reservoir plastic are especially hospitable to microscopic pathogens and fibrinous blood products, the accumulation of which can result in infection and/or sepsis.

24. According to Defendants' marketing materials, the polyurethane catheter "has less propensity for surface biodegradation, making it more resistant to environmental stress cracking."

25. The polyurethane comprising the catheter in the PowerPort is a formulation called Chronoflex AL, which Defendants obtain from a biomaterials supplier called AdvanSource Biomaterials Corporation (AdvanSource), which is a division of Mitsubishi Chemical America, Inc.

26. Chronoflex AL is one of a large number of biomaterials manufactured by AdvanSource, many of which have mechanical properties superior to Chronoflex AL.

27. The Chronoflex catheter included in Defendants' PowerPort is comprised of a polymeric mixture of polyurethane and barium sulfate, a compound which is visible in certain radiologic studies.

28. Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter

over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the catheter.

29. The mechanical integrity of a barium sulfate-impregnated polyurethane is affected by the concentration of barium sulfate as well as the homogeneity of the modified polymer.

30. Defendants' manufacturing process in constructing the Chronoflex Catheters implanted in Plaintiff, involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

31. This improper mixing led to pockets of barium sulfate and entrapped air being distributed through the catheter body and on the inner and outer surfaces of same.

32. This defect in the manufacturing process led to a heterogeneous modified polymer which led to an irregular catheter surface replete with fissures, pits and cracks.

33. The roughened catheter surface leads to the collection and proliferation of microbes and/or fungi, thereby drastically increasing the risk of infection and sepsis.

34. This unsafe condition and the resulting risk for infection increases over time as barium sulfate continually dissociates from the catheter surface, a risk Defendants did not communicate to Plaintiff or his physicians.

35. Although the surface degradation and resulting risk of infection can be reduced or avoided with design modifications to encapsulate the radiopaque compound or by using a different polymer formulation, Defendants elected not to incorporate those design elements into the Device.

36. At all times relevant, Defendants misrepresented the safety of the PowerPort system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled,

marketed, distributed, and sold the PowerPort system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

37. At all times relevant to this action, Defendants knew and had reason to know, that the Device was not adequately tested and was not safe and effective for patients implanted with the Device.

38. At all times relevant to this action, Defendants knew and had reason to know, that the PowerPort was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to surface degradation and resulting infection, mechanical failure, and a variety of other complications.

39. At all times relevant to this action, Defendants knew and had reason to know that patients implanted with PowerPorts had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; hemorrhage; thromboembolism; cardiac arrhythmia; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries to remove the defective device.

40. Soon after the PowerPort was introduced to market, which was years before Plaintiff was implanted with his devices, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the PowerPort was precipitating thromboembolism post-implantation. Defendants also received large numbers of AERs reporting that PowerPort was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

    a. hemorrhage;

    b. infection;

    c.   cardiac/pericardial tamponade;

    d.   cardiac arrhythmia and other symptoms similar to myocardial infarction;

    e.   severe and persistent pain;

    f.   perforations of tissue, vessels and organs; and

    g.   upon information and belief, even death.

41. In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are thousands of recorded device failures and/or injuries related to the Defendants' implantable port products – including the product implanted in Plaintiff – which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

42. The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient advocacy groups. [1]

43. Prior to the discontinuation of the ASR program, Defendants reported thousands of episodes of failures of their implanted port/catheter products, thereby concealing them from physicians and patients.

44. Defendants were aware or should have been aware that the PowerPort had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

45. Defendants also intentionally concealed the severity of complications caused by the PowerPort and the likelihood of these events occurring.

46. Rather than alter the design of the PowerPort to make it safer or adequately warn

---

[1] Christina Jewett, Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices, Kaiser Health News (Mar. 2019)

physicians of the dangers associated with the PowerPort, Defendants continued to actively and aggressively market the PowerPort as safe, despite their knowledge of numerous reports of serious complications and injuries.

47. Multiple feasible safer alternative designs for the PowerPort have been available to Defendants at all times relevant to this matter.

48. Those safer alternative design elements include but are not limited to:

a. Coating or encapsulation of the surfaces of the catheter with a polymer free of barium sulfate;

b. Utilizing a combination of radiopacity agents to reduce the overall volume of barium sulfate per unit of surface area;

c. Constructing the port reservoir with a titanium backing.

49. The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff. Defendants had actual knowledge of the dangers presented by the PowerPort System, yet consciously failed to act reasonably to:

a. Adequately Inform or warn Plaintiff, his prescribing physicians, or the public at large of these dangers;

b. Establish and maintain an adequate quality and post-market surveillance system; or

c. Recall the PowerPort System from the market.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

50. On or about April 20, 2019, Plaintiff was implanted with a Bard PowerPort M.R.I. Implantable Port via right internal jugular vein, for administration of total parenteral nutrition (TPN) in treatment of gastroparesis. This procedure took place at Centerpoint Medical Center in

Independence, Jackson County, Missouri, and was performed by Dr. Jonathan D. Patterson, M.D.

51. On or about April 11, 2020, Plaintiff presented himself to the emergency department at Centerpoint Medical Center with complaints of fever and shortness of breath. Blood cultures were taken and came back negative. No further testing was done, and Plaintiff was discharged home the following day.

52. On or about April 17, 2020, Plaintiff had a follow-up appointment with his primary care physician, who instructed Plaintiff to go back to the emergency room due to positive blood cultures. Plaintiff went to Centerpoint Medical Center where blood cultures were repeated and came back positive. Previous blood cultures taken on or about April 11, 2020, were reviewed by medical personnel and determined that they were likely contaminated.

53. On or about April 19, 2020, Plaintiff was admitted to Centerpoint Medical Center for port removal after multiple blood cultures were positive for gram positive cocci. After port removal, the catheter tip was sent for blood cultures, which confirmed the catheter was infected.

54. On or about November 23, 2020, Plaintiff was implanted with a Bard PowerPort isp M.R.I. Implantable Port via left internal jugular vein, for administration of total parenteral nutrition (TPN) in treatment of gastroparesis. This procedure took place at Belton Regional Medical Center in Belton, Cass County, Missouri, and was performed by Dr. Austin Lehr, M.D.

55. On or about July 9, 2021, Plaintiff presented himself to Research Medical Center in Kansas City, Jackson County, Missouri, for removal of his infected port by Dr. Austin Lehr, M.D. After removal, the catheter tip was sent for blood cultures, which confirmed the catheter was infected.

56. Due to the defective devices, Plaintiff suffered damages and continues to suffer

damages including, but not limited to, undergoing unnecessary major surgeries, increased risk of future severe and permanent injuries, severe emotional distress, ongoing fear and anxiety from future injuries, including but not limited to, cardiac tamponade. Plaintiff

57. The Defendants concealed—and continue to conceal—their knowledge of the PowerPort's unreasonably dangerous risks from Plaintiff and his physicians.

58. Numerous reports of severe complications and injuries from the Device—with no evidence of medical-provider error—were recorded and reported to Defendants before the Device was implanted into Plaintiff.

59. However, Defendants continued to actively and aggressively market the PowerPort as safe, despite knowledge of numerous reports of such injuries. Defendants utilized marketing communications, including the Instruction for Use, and direct communications from sales representatives to Plaintiff's health care providers to intentionally mislead his health care providers into believing these failures were caused by factors other than catheter design and composition.

60. Defendants did not adequately warn Plaintiff or Plaintiff's physicians of the true quantitative or qualitative risk of infection associated with the Device.

61. Defendants did not adequately warn Plaintiff or Plaintiff's physicians that the risk of infection associated with the Device increases the longer the product is placed in a patient.

62. Defendants did not adequately warn Plaintiff or Plaintiff's physicians that the function and integrity of the Device should be closely monitored when the device is in place for over a year to reduce the risk of injury.

63. Defendants did not adequately communicate the extent or seriousness of the danger of infection to Plaintiff or his physicians.

64. Rather than alter the design of their product to make it safer or warn physicians of the dangers associated with the PowerPort, the Defendants chose to continue their efforts to promote their defective product.

65. Plaintiff's physicians relied upon the representations, including the instructions for use distributed with the product implanted in Plaintiff, and advertisements to Plaintiff's detriment.

66. The Defendants knowingly concealed the dangerous propensity of this device to precipitate infection. Defendants' further concealed their knowledge that these failures were caused by the catheter design, that the risk of infection increases with catheter dwell time, and that the failures were known to be causing serious injuries.

67. As a result of the failure of the Defendants' PowerPort and the Defendants' wrongful conduct in designing, manufacturing, and marketing this defective product, Plaintiff and Plaintiff's physician were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of the Defendants' acts, omissions and misrepresentations.

68. The Defendants failed to conduct adequate and sufficient post-marketing surveillance after they began marketing, advertising, distributing and selling the PowerPort.

69. As a result of the Defendants' actions and inactions, Plaintiff was injured due to the use of the PowerPort, which has caused and will continue to cause Plaintiff's various physical, mental, and emotional injuries and damages. Accordingly, Plaintiff seeks compensatory damages.

## COUNT I – NEGLIGENCE – ALL DEFENDANTS

70. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

71. Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

72. The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling and conducting post-market surveillance of the PowerPort.

73. The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

   a.  Failing to properly and thoroughly test the PowerPort before releasing the device to market, and/or failing to implement feasible safety improvements;

   b.  Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the PowerPort;

   c.  Failing to conduct sufficient post-market testing and surveillance of the PowerPort;

   d.  Designing, manufacturing, marketing, advertising, distributing, and selling the PowerPort to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of the PowerPort and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

   e.  Failing to exercise due care when advertising and promoting the PowerPort; and

   f.  Negligently continuing to manufacture, market, advertise, and distribute the PowerPort after Defendants knew or should have known of its adverse effects.

74. As a direct and proximate result of the Defendants' actions, omissions and

misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

75. In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice so as to justify an award of punitive and/or exemplary damages.

<u>**COUNT II – STRICT PRODUCTS LIABILITY –**</u>
<u>**FAILURE TO WARN – ALL DEFENDANTS**</u>

76. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

77. Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

78. Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the PowerPort, including the ones implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

79. At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter system to administer the medications. Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities, and further failed to adequately

provide instructions on the safe and proper use of the device.

80. Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the PowerPort that was implanted into Plaintiff that the PowerPort posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

81. Defendants further knew that these devices raised the risk of infection by virtue of the catheter design and composition.

82. Defendants further knew that the risk of infection increases with catheter dwell time.

83. As a result, the device was unreasonably dangerous when put to its reasonably anticipated use in that the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it.

84. Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the PowerPort in that Defendants:

   a. Failed to provide any warning of the true quantitative or qualitative risk and the true extent of infection associated with the PowerPort product to Plaintiff or his physicians;

   b. Failed to provide any warning that the risk infection increases with catheter dwell time; and

   c. Failed to provide any warning as to the true extent or seriousness of the danger of infection that the device could cause.

85. No reasonable health care provider, including Plaintiff's health care providers, and no reasonable patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

86. Had the Defendants provided an adequate warning of the risks attendant to the PowerPort enumerated herein, Plaintiff would not have consented to be implanted with the product.

87. The warnings, labels, and instructions provided by the Defendants at all time relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

88. The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

89. The devices, which were designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, were defective at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

90. When Plaintiff was implanted with the devices, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the devices, as discussed herein.

91. Defendants intentionally underreported the number and nature of adverse events to Plaintiff's health care providers, as well as the FDA.

92. Neither Plaintiff nor his health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

93. Plaintiff and his health care providers used the PowerPorts in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream.

94. Moreover, Plaintiff's health care providers did not place or maintain the devices

incorrectly such that it increased the risk of malfunction.

95. Upon information and belief, the defective and dangerous condition of the device, including the ones implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations. Upon information and belief, the devices implanted in Plaintiff were in the same condition as when they was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

96. Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be determined at trial. In other words, had Defendants provided adequate warnings, Plaintiff and his physicians would not have used the device.

## COUNT III – STRICT PRODUCTS LIABILITY – DESIGN DEFECT – ALL DEFENDANTS

97. Plaintiff incorporates the preceding paragraphs as if set out fully herein.

98. Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

99. Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the PowerPorts that were implanted into Plaintiff.

100. The PowerPorts implanted in the Plaintiff were not reasonably safe for its intended use and were defective with respect to its design.

101. The PowerPorts were in a defective condition at the time that they left the possession or control of Defendants.

102. The PowerPorts were unreasonably dangerous to the user or consumer.

103.    The PowerPorts were expected to and did reach the consumer without substantial change in their condition.

104.    At all relevant times, there existed a safer, feasible alternative design which would have reduced or eliminated the risks that led to the Plaintiff's injuries.

105.    Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging and selling the defective products.

106.    As a direct and proximate result of the PowerPorts' aforementioned defects, the Plaintiff was caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

### COUNT IV – BREACH OF IMPLIED WARRANTY – ALL DEFENDANTS

107.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

108.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

109.    Defendants impliedly warranted that the PowerPort was merchantable and fit for the ordinary purposes for which it was intended.

110.    When the PowerPorts were implanted in the Plaintiff, they were being used for the ordinary purposes for which they were intended.

111.    The Plaintiff, individually and/or by and through his physician, relied upon Defendants' implied warranties of merchantability in consenting to have the PowerPorts implanted in him.

112.    Privity exists between Plaintiff and Defendants because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a

third-party beneficiary of the subject contract.

113.    Defendants breached these implied warranties of merchantability because the PowerPorts implanted in the Plaintiff were neither merchantable nor suited for their intended use as warranted in that the devices varied from their intended specifications, which included, but is not limited to, the following:

    a.    Defendants' manufacturing process in constructing the Chronoflex Catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles, leading to improperly high viscosity of the raw polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

    b.    This improper mixing leads to pockets of barium sulfate and entrapped air being distributed throughout the catheter body and on the surface of the catheter; and

    c.    The roughened catheter surface increases the risk of fracture and migration and leads to the collection and proliferation of microbes and/or fungi, thereby drastically increasing the risk of infection and sepsis.

114.    Defendants' breaches of their implied warranties resulted in the implantation of unreasonably dangerous and defective PowerPorts in the Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

115.    The PowerPorts were sold to the Plaintiff's health care providers for implantation in patients, such as the Plaintiff.

116.    As a direct and proximate result of Defendants' breaches of the aforementioned implied warranties, the Plaintiff was caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss,

including, but not limited to, obligations for medical services and expenses, and other damages.

117.    Upon information and belief, Plaintiff's health care providers sent notice to Defendants of the adverse event and thus, the nonconformity of the device at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

## **COUNT V– BREACH OF EXPRESS WARRANTY – ALL DEFENDANTS**

118.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

119.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

120.    Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the PowerPort was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

121.    The PowerPort does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

122.    At all relevant times, the PowerPorts did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

123.    Plaintiff, his physicians, and the medical community reasonably relied upon the Defendants' express warranties for the PowerPort.

124.    Privity exists between Plaintiff and Defendants because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

125.    At all relevant times, the PowerPort was used on Plaintiff by Plaintiff's physicians

for the purpose and in the manner intended by Defendants.

126.    Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

127.    As a direct and proximate result of the breach of Defendants' express warranties, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

128.    Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event and thus, the nonconformity of the device at issue, within a reasonable time following discovery of the breach of warranty and before suit was filed.

## <u>COUNT VI – FRAUDULENT CONCEALMENT – ALL DEFENDANTS</u>

129.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

130.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

112.    Beginning from the time Defendants introduced the devices to the marketplace and continuing to present, Defendants fraudulently concealed information with respect to the PowerPort in the following particulars:

a.  Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the PowerPort was safe and fraudulently withheld and concealed information about the substantial risks of using the PowerPort, including infection;

b.  Defendants represented that the PowerPort was safer than other alternative systems

and fraudulently concealed information which demonstrated that the PowerPort was not safer than alternatives available on the market;

c.   Defendants concealed the dangerous propensity of this device to precipitate infection;

d.   Defendants concealed their knowledge that these failures were caused by the catheter design, that the risk of infection increases with catheter dwell time, and that the failures were known to be causing serious injuries; and

e.   That frequency of these failures and the severity of injuries were substantially worse than had been reported.

113.   The Defendants had sole access to material facts concerning the dangers and unreasonable risks of the PowerPort.

114.   The concealment of information by the Defendants about the risks of the PowerPort was intentional, and the representations made by Defendants were known by Defendants to be false.

115.   The concealment of information and the misrepresentations about the PowerPort was made by the Defendants with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

116.   Plaintiff and his physicians relied upon the representations and were unaware of the substantial risks of the PowerPort which the Defendants concealed from the public, including Plaintiff and his physicians.

117.   As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged

herein. These damages have occurred in the past and will continue into the future.

118.    The Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants for their conduct, in an amount sufficiently large to be an example to others, and to deter this Defendants and others from engaging in similar conduct in the future.

119.    Had Defendants not concealed this information, neither Plaintiff's nor his health care providers would have consented to using the devices in Plaintiff.

**COUNT VII – VIOLATION OF THE MISSOURI**
**MERCHANDISING PRACTICES ACT – ALL DEFENDANTS**

120.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

121.    Plaintiff brings this count against Defendants BD, Bard, BAS, and Does 1 through 10, inclusive.

122.    Plaintiff purchased the PowerPorts, and the products were intended for personal use.

123.    The acts and practices engaged in by Defendants constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, (MMPA), RSMo. § 407.010, *et seq.*

124.    Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the PowerPort in violation of RSMo. § 407.020.

125.    Plaintiff purchased the PowerPorts, products that were falsely represented, as set out above, in violation of the MMPA, *inter alia*, that they were reasonably safe for use and better

than alternative designs and alternative products available.

126.    As a result, Plaintiff suffered economic damages in that the products he purchased were worth less than the products he thought he had purchased had Defendants' representations been true.

## **PUNITIVE DAMAGES**

127.    Plaintiffs are entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare. Defendants intentionally and fraudulently misrepresented facts and information to both the healthcare community and the general public, including Plaintiff and his health care providers, by making intentionally false and fraudulent misrepresentations about the safety and efficacy of the PowerPort. Defendants intentionally concealed the true facts and information regarding the serious risks of harm associated with the implantation of said product, and intentionally downplayed the type, nature, and extent of the adverse side effects of being implanted with the device, despite Defendants' knowledge and awareness of the serious and permanent side effects and risks associated with use of same. Defendants further intentionally sought to mislead health care providers and patients, including Plaintiff and his health care providers, regarding the cause of infection, dislodgement, and migration failures of the device.

128.    Defendants had knowledge of, and were in possession of evidence demonstrating that, the PowerPort caused serious physical side effects. Defendants continued to market said product by providing false and misleading information with regard to the product's safety and efficacy to the regulatory agencies, the medical community, and consumers of the device, notwithstanding Defendants' knowledge of the true serious side effects of the PowerPort,

Defendants failed to provide accurate information and warnings to the healthcare community that would have dissuaded physicians from surgically implanting the PowerPort and consumers from agreeing to being implanted with the PowerPort, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and implanting the PowerPort.

129.    As a direct, proximate, and legal result of Defendants' acts and omissions a described herein, and Plaintiff's implantation with Defendants' defective product, Plaintiff suffered, and will continue to suffer, the injuries and damages described in this complaint.

**WHEREFORE**, Plaintiffs demands judgment against Defendants for compensatory, special, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a.    Judgement be entered against all Defendant on all causes of action of this Complaint;

b.    Plaintiff be awarded his full, fair, and complete recovery for all claims and causes of action relevant to this action;

c.    Plaintiff be awarded general damages according to proof at the time of trial;

d.    Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e.    Plaintiff be awarded costs and attorney's fees in connection with Plaintiff's Missouri Merchandising Practices Act (MMPA) claim under RSMo. § 407.010, *et seq.,* and RSMo. § 407-025;

f.    Plaintiff be awarded punitive damages according to proof at the time of trial;

g.     Awarding pre-judgment and post-judgment interest to the Plaintiff;

h.     Awarding the costs and the expenses of this litigation to the Plaintiff.

i.     For such other and further relief as the court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

**Respectfully submitted by,**

**HOLMAN SCHIAVONE, LLC**

By: */s/ Anne W. Schiavone*
Anne Schiavone, MO #49349
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
aschiavone@hslawllc.com

ATTORNEYS FOR PLAINTIFF